GRAPHIC ARTS CO. v. PHOTO-CHROMOTYPE ENGRAVING CO.

(Circuit Court of Appeals, Third Circuit. January 28, 1916.)

No. 2005.

1. PATENTS ☞328—INFRINGEMENT—PROCESS AND APPARATUS FOR ETCHING METAL PLATES.

The Levy patent, No. 627,430, for a process of and apparatus for etching metal plates, claims 2, 5, and 7 relating to the process, and claim 20 re-

lating to apparatus, as limited by the prior art and the proceedings in the Patent Office, *held* not infringed.

2. WORDS AND PHRASES—"ATOMIZED."

The word "atomized" means, in common usage, the form that liquids assume when projected by a blast of air, gas, or steam, breaking them up into very small particles.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Suit in equity by the Graphic Arts Company against the Photo-Chromotype Engraving Company. Decree for defendant, and complainant appeals. Affirmed.

For opinion below, see 221 Fed. 648.

Robert M. Barr, of Philadelphia, Pa. (Otto Munk and Livingston Gifford, both of New York City, of counsel), for appellant.

Howson & Howson, of Philadelphia, Pa. (Charles Howson and Charles H. Howson, both of Philadelphia, Pa., of counsel), for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. The Graphic Arts Company is now the owner of patent No. 627,430, which was applied for in January, 1899, and was issued on June 20 of the same year to the assignee of Louis F. Levy, the inventor. The patent is for improvements in the art of etching metal plates, and, although part of the specification has been influenced by the fact that the inventor had especially in mind the photographic method of transferring the design to the plate, much of the specification and all the claims apply also to any plate that is to be etched by the use of a mordant, or liquid erodent, whether or not photography has been one step in the process. The specification begins by saying:

"This invention relates to a process of and apparatus for producing etched metal plates, more particularly such metal plates as are used in photomechanical engraving or such branches of the art, where metal plates are etched by acid or other liquid erodent to form in the plates lines, furrows, indentations, or striations for the production of printing-surfaces.

"The object is, by the employment of a mordant, to produce a printing-surface upon metal in which the indentations or lines produced as the result of the process are of a more perfect character than those produced by the means ordinarily used; also, to reduce the cost of production and obviate many of the objections incident to the processes and means heretofore employed."

There are 30 claims, divided into two groups, one for a process and the other for an apparatus; and the defendant is charged with infringing three claims of the first group and one claim of the second.

"2. The process of etching metal plates, consisting in projecting a mordant, in atomized form, upon a plate having thereon a design, which plate is maintained within an inclosed space, the surface to be etched being substantially at right angles to the direction of projection of the mordant, substantially as set forth."

"5. The process of etching metal plates by a mordant, which consists in atomizing or spraying the mordant upon the surface of a prepared plate, moving the plate while it is being etched to change its position with respect to the atomizer, for the purpose set forth."

"7. The process of etching metal plates having thereon a design in resist,

which consists in projecting an atomized erodent against such prepared metal surface to at the same time that the etching proceeds absorb the heat which arises from chemical reaction, whereby heating of the resist is obviated."

"20. In an apparatus for the production of designs in metal plates by etching, the combination with an etching-box having means for sustaining therein a plate, a tank for the mordant, an air-chamber within the etching-box, and means for projecting the mordant against the plate."

The District Court dismissed the bill on the ground of non-infringement. 221 Fed. 648.

[1] We do not agree with the argument that the invention in question is primary, and should therefore be allowed a wide range of equivalents. On the contrary, we think the scope of the patent, efficient as it no doubt is, has been much restricted, both by the prior art and by the proceedings before the Examiner. It is well known that the art of etching, strictly so called—the use of acid to bite a design on metal—is very old; we need only recall the fame of Rembrandt, who is still one of the foremost names in the history of engraving, although he died nearly 250 years ago. From the beginning, the essence of the process has been to protect part of the plate by some substance that can successfully "resist" the attack of the acid, and to leave exposed so much of the metal as will outline the design after the biting has taken place. Under the date of 1767 Diderot's Encyclopedia contains an illustrated article showing unmistakably that before the middle of the eighteenth century it was old to prop the plate up or suspend it, and to flow or pour the acid upon it until the operation was finished. The same article shows that it was also old to collect the acid in a receptacle for repeated use, and to turn the plate now and then for the purpose of avoiding "undercutting" of the raised surfaces and of promoting uniformity in the biting effect. One of the plates illustrates how to apply the acid by confining the plate in a closed box, or portable chamber, that is held on the knees of the operator and is rocked to and fro by hand, the double object being to protect the workmen from fumes and to keep the acid moving so as to promote uniformity in biting. This is the "tub" method, which has never been completely superseded, and indeed is probably used by a majority of etchers to-day, in spite of the fact that for a good many years more than one machine has been devised and has done efficient work. There are mechanical devices for rocking the plate, but otherwise the tub method has persisted with little, if any, change, and has been used in etching half tones and other varieties of photographic plates, as well as plates of the older methods. Indeed, the record contains little evidence to show that the patent in suit has met a long and acutely felt want, or is anything else than a device of rather narrow range.

Without going into the details of other publications or of earlier patents, it is enough to say briefly that before 1899 it was old to use a box or a closed chamber, with or without ventilating means, mainly in order to protect the workmen; and it was also old to spray or rain the acid by low pressure upon the plate—which might be placed either vertically or horizontally—instead of using the tub method of immersion. But we may quote Anthony's Photographic Bulletin of June, 1896, as sufficiently describing how the acid might be applied:

"In the January number of the bulletin, page 29, was this paragraph:

"'I have tried electric and various other means to hasten the operation of etching plates in relief, and am convinced that the quickest method will result from letting the etching solution fall like rain from a height on the plate or plates to be etched. Now, who will devise a means of pumping the etching fluid to a height, so that it can be used over and over again, and also separate the solution while falling into drops?'"

And the Bulletin then goes on to repeat the following comment by a London publication:

"Anent the note from Anthony's Bulletin by Mr. Horgan, evidently he has taken the idea from the old French method of etching, yclept, 'eau forte à couler,' where the plate was placed at an angle of 45 degrees, and the etching fluid dashed upon it. Amateurs say that etchings done by that method have something superior about them to the ordinary plates, where the fluid is left on the plate. Most likely the raison d'etre of this is that the metal, coming in contact with the air during the time that the biting is carried on, is attacked more vigorously and cleaner. I would suggest that plates to be etched are put in a bath, which is stood at an angle of 45 degrees, or thereabouts, and at the lower corner place a vessel like a watering can, but, of course, acid proof. Now the etching fluid, contained in a similar receptacle, is poured over the plate, and, running down, is caught in the first vessel. As soon as the whole of the mordant has been used, the empty receptacle is placed underneath, and the mordant is poured over from the other one, and vice versa ad lib."

The writer in the Bulletin then describes a process of dropping which he himself had devised, prefacing it by the following paragraph:

"The idea of dropping the acid mordant on the plate to be etched would naturally come to one who has rocked an etching bath and watched the acid flow back and forth over the plate, the etching solution operating with the greatest energy on the tops of the lines, and least in the hollows between the lines. Then, when one thinks of the powerful abrading action of sand when dropped from a slight height on hard substances, the idea of dropping the acid is suggested. I, however, remember seeing, when a boy, how the raindrops from the shingles of our roof had bored holes ·in the stones on which they had fallen for years. So I felt that dropping acidulated water on a metal plate from a height would dissolve the metal away quicker than by simply letting it flow over it."

During the last 30 or 40 years the word "etching" has been expanded to include the sand-blast process, which uses no acid, but relies on abrasion by sand, emery, or a like substance. By driving a stream of these hard particles, either by steam, air, water, or other gaseous or liquid medium, or by the propelling force of a rapidly revolving fan or drum, a design may be outlined on metal or other substances. The degree of force required to operate the blast successfully will vary as the object or the other circumstances of the operation vary. It seems to be agreed that the sand-blast art begins with the Tilghman patent of 1870, but we shall confine our attention to the later and more significant Truchelut patent. This was first issued in France in May, 1895; and after reciting as follows:

"For the engraving or grooving of metals, marble, stone, horn, ivory, etc., three processes are now known. The first consists in removing by means of a scoop, etching tool, or blunt body, the part to be engraved; for the second, chemical products such as acids are used, the dissolving action of which produces a result less beautiful but more economical; the third, an object already of several brevets, consists in projecting, mechanically, a hard powder against a friable body, such as glass and marble, which stipples the latter and produces by its multitude of microscopic points, the deepest engraving in a

few moments. Unfortunately this last process, the most advantageous, is useful, as we have just said, only for friable objects, but is not practicable for malleable bodies such as metals"

—the patentee proposed to combine abrasion and chemical action. He stated the principle to be:

"We have thought, in order to arrive at a good result, and it is this which is the object of the present invention, to combine this scraping action with a solid or liquid ingredient capable of producing upon the body to be engraved a chemical dissolving action of the kind of engraving termed 'acid' engraving, which we have above indicated. It follows that by these two combined actions the chemical body produces its effect more easily, the part to be engraved being continually cleaned (scraped) by the sand."

And he then proceeded as follows:

"Given the principle which we have just described of this discovery, the form and the size of apparatus can be infinitely varied; it operates simply by projecting a powder and a body chemically attacking the object to be engraved. This powder can equally produce the two effects. To give an example, we will cite the perchloride of iron which, projected with force against copper, produces a very rapid action. Every chemist will understand that we can use a variety of powder and materials which, slightly damp, have a chemical action upon the body to be operated on. These powders and these materials vary infinitely and are known to every chemist. As to the employment of a liquid, and an inert material, such as sand, emery, etc., we can utilize the same liquids which are used in present engraving upon similar substances. Thus, giving still another example, we can take azotic acid for zinc and copper; aqua regia for steel, gold, silver, platinum; hydrochloric acid for aluminum, horn, ivory, marble, and potassium for wood; hydrofluoric acid for glass, slate, granite. We repeat, the first chemist met will indicate the sort of liquids which will best suit for the material to be engraved.

"We can use as a resist in all processes, such as albuminous or charcoal, bitumen of Judea, or simple litho- or typo-graphic resist, all processes actually in use among engravers."

His apparatus was very simple, as will be seen from the accompanying cut and the description of the patent:

"This apparatus consists of a vessel, *A B*, arranged like an autoclave; raising the cover, *C*, we introduce the previously described substances, and close the cover by screwing it firmly upon the vessel by means of the bolts, *D*. By the pipe, *F*, compressed air arrives which serves to facilitate a humid or aqueous mixture off sand and chemical product. This leaves the vessel by the tube, *H*, at the lower part of the apparatus, and is projected violently against the object to be engraved placed at *K*, by means of a current of compressed air arriving by the tube, *M*. Under these conditions the sand and the acid are constantly renewed. It is certain that the jet can be produced in all directions, in order to engrave an object placed vertically, horizantally, below or above."

In January, 1896, a provisional specification was filed in England (completed later in the year) substantially to the same effect; and in the same month the inventor took out a German patent, with the following claim:

"A process of etching characterized by the fact that a hard powdered substance in combination with a solvent acting chemical liquid is projected with great force against the surface to be etched to simultaneously produce an etching action in mechanical and chemical manner."

In May, 1896, he filed the following certificate of addition to his French patent:

"Since the brevet I have made numerous experiments with my general process of engraving. I have employed the most varied materials in order to arrive at the best results; that is to say, I have sought active products which, projected violently against the surface to be engraved, exert there simultaneously a mechanical and scraping action, and a chemical and dissolving action. So much for the moist mixture described in details in the brevet.

"But I have discovered during my work that in certain cases I can dispense with the hard bodies reduced to powder which I mix with the liquids. Under very high pressures, in fact, the liquid alone projected against a body to be engraved acts in a mechanical manner and removes the molecules, while chemically dissolving the surface. Consequently I can engrave, according to my new process, without mixing hard powder in the dissolving liquid."

And in June of that year the following addition was made to the German patent:

"Further experiments have shown that in certain cases the employment, in etching, of a mixture of liquid and finely powdered substances can be entirely dispensed with. Furthermore, it will suffice to direct the liquid alone, under great pressure, against the surface to be etched, whereby it will act in similar manner, and, indeed, by the great pressure, in a mechanical manner, and chemically by dissolution. According to the foregoing process one is in a position to etch a desired surface, by projecting the desired liquid, finely divided, and under great pressure, against the outer surface without having to mix the liquid with a hard powder.

#### "Patent Claim.

"A variation of the process described in patent, No. 89,146, characterized by projecting, under great pressure, a chemical liquid alone which will have a dissolving action for the purpose of etching and without the addition of solid substances, against the surface to be etched."

In our opinion this patent—to say nothing of others—occupies a good deal of the ground claimed by Levy. How far Truchelut was justified in believing that these finely divided particles would have an important mechanical effect during the few minutes required for the acid to act we are not prepared to say. But at all events, it is

evident that his "violent" action and "very high pressures" are phrases that must be allowed some elasticity. He specifies no pressures (and neither does the patent in suit), not even a range between maximum and minimum, and says nothing about the best or preferred distance between the plate and the nozzle; but we think it plain that a skillful etcher could not fail to see that the degree of force, like the distance of the plate or the strength of the acid, should be adapted to the kind of work to be done. Of course, the resist must be preserved, and the acid should also be properly distributed. And we regard it as entitled to weight that during the course of this litigation a crude machine for experimental use has been built after the instruction of the Truchelut patent, and has done excellent work, even on photographic plates, at pressures ranging between 2 and 15 pounds, and at distances varying from 18 inches to 4 feet between the plate and the nozzle.

The Patent Office held a similar opinion concerning the limiting effect of the Truchelut invention. The Levy patent was preceded by three applications—probably to be regarded as continuous, although two of them were abandoned—running in time from November 5, 1897, to June 20, 1899, the date of issue; and the file wrappers show that Truchelut was continually cited against the applicant, and that Levy made frequent attempts to escape the reference. But in several particulars he acquiesced in the position of the examiner, and was in the end obliged to confine his patent to the use of an atomizer in a closed space, the inclosure having a particular and defined object. When the application finally emerged from the Patent Office, the specification contained the following statements, inter alia:

"The present invention includes an essentially new process of applying the mordant to a prepared plate, which mordant is projected and atomized upon the plate to form therein, where not protected by the resist and, after a certain depth is etched out, cupped or concave indentations or lines. The carrying out of the process embodies the use of compressed air and ejector-nozzles for projecting the mordant in the form of atomized spray upon a prepared metal surface, so that the mordant which is projected thereon will drop therefrom without flowing, the plate and atomizers being within a chamber or etching-box, so that the compressed air used to protect the acid or mordant will be permitted to expand in the chamber to reduce the temperature thereof and absorb the heat which is given off by the chemical action of the erodent on the exposed portions of the plate. The chemical combination of the mordant with the metal is accelerated by the dynamic force of the impact, which causes each atomized particle of the mordant to become practically saturated with the metal base instantly upon contact. This results in eroding or cutting away the metal in the direction of the impact faster than the same action proceeds laterally, so that much or all of the required vertical depth may be etched before the lateral action of the mordant can materially affect the work. Moreover, the forcible impact of the atomized spray, besides accelerating the chemical combination of the mordant and the metallic base, prevents adhesion to the plate of bubbles of the hydrogen gas and scum of metallic oxide, which are developed by the chemical action and which in ordinary practice are removed by the workmen with a brush; also, by the use of compressed air for projecting the mordant, the heat evolved by the chemical action of the mordant on the plate is absorbed by expansion of the air in the chamber, thus keeping the chamber and the plate cool, so that a stronger mordant than is usually employed can be used without detriment to the resist. * * *

"In some character of work the plate may be etched to a sufficient depth without applying other than the original resist thereto, and in such work the

position of the plate in the etching-box with respect to the distance from the atomizing-nozzles may be varied as the etching proceeds.

"In practice the etching fluid is impinged upon the plate in the form of a spray of minute particles, which do not affect that portion of the plate which is covered by the resist; but where the design on the metal is more or less broadly exposed, the mordant or etching fluid collects and adheres, depending therefrom in the form of spherical drops, which are constantly being added to by fresh accretions. The mordant which thus adheres to the plate is kept in motion by the impact of new particles of the spray, and the particles of metal which are removed by the mordant fall to the lower portion of the depending globules, so that the particles which are removed from the plate fall immediately therefrom. The tendency of a drop of etching fluid or mordant, depending from a plate maintained in a horizontal position, is to assume a spherical form, and this of itself, after the plate has been eroded to such depth as to give effect to the drops, tends to cut a concave or cupped depression, while avoiding lateral erosion or undercutting. Etching by projecting the mordant in the form of spray upon the metal effects a great gain in rapidity of operation over the methods usually practiced, as a much stronger etching fluid may be used. The chemical action of the mordant proceeds faster vertically or in direction of the impact than otherwise. The impact of the minute particles of the mordant does not disturb the resist which forms the design, and the heat generated by the chemical action of the mordant upon the plate is absorbed by the compressed air as it expands, which keeps the mordant, the resist, and the plate cool. With the apparatus shown the air which has been previously compressed is allowed to expand and circulate in the etching-box so that the etching fluid which drops from the plate passes through a body of cooled air into the tank from which it was taken, and the fumes which are given off by the process of etching are carried away by the ventilating-pipe.

"In practice the minute particles of the acid or mordant impinging against the plate have their normal force or chemical affinity enhanced by the force of their impact, which results in each particle of the acid or mordant becoming saturated with the metallic base immediately on contact with the latter, and the mordant thus loses the power of further dissolving the metal. Each succeeding particle impinges in the direction in which the etching is desired to proceed, and the process may be safely continued to a depth beyond which the finer and closer lines of the design would become too frail to stand the strain of printing were the metal undercut.

"The rapid decomposition of the metal by the acid develops an amount of heat which would soon warm the plate to a degree where the resinous resist would soften and give way; but this is prevented by the absorption of the heat evolved by the expansion of the compressed air in the chamber, the expansion being sufficient to absorb even more heat than is developed on the plate, so that the plate and etching liquid is kept quite cool. A further advantage resulting from the use of a chamber or etching-box is that the gases and fumes which are so abundantly generated by the rapid chemical composition of the metal are carried off by the air which escapes through the ventilating-pipe, which pipe may lead to a chimney, and in this way the work-room is kept free from these deleterious vapors.   *   *   *

"In the preparation of a zinc plate for etching the design is produced on the plate in some fatty ink by the usual photographic process. The plate is then further prepared by first melting into combination with the ink image some resinous powder to strengthen the image or design against the action of the acid, the open parts of the design or where the plate is to be etched being left exposed, such steps in the process being such as are usually practiced. My process has to do principally with etching such a prepared plate to produce therein indentations, adjacent to which are the printing-surfaces from which an impression similar to the design can be made, and it is obvious that the design which has been produced on the plate may be readily destroyed, either by abrasion, which would remove the resist, or by heat, which would soften or melt the resist. When a plate is etched by the usual means, the depression or lines are not only cut into the plate vertically, but also sidewise,

which results in undercutting and in the production of depressions in the plate, the surfaces adjacent thereto being serrated, or, as it is technically called, "rotten."

"The apparatus which I have shown is one which may be used for commercially carrying out the process, and it may be varied in many particulars. For instance, where water under sufficient pressure can be had, the water-tank and connections therefrom may be dispensed with. Other means may be used to supply compressed air to the nozzles of the atomizers, and any suitable form of atomizer may be used for projecting the mordant upon the plate."

Without taking up the file wrappers in detail, we think the chief modification made by the applicant to avoid the Truchelut reference may be fairly stated as follows:

He first tried to patent a process covering broadly the projection of an atomized mordant upon a plate that stood substantially at right angles to the stream of particles. Truchelut was cited against him, and he sought to differentiate by amending the claim so as to include maintaining the plate within a closed space, and by amending the specification so as to define the function of the space, namely to allow the compressed air or similar fluid to expand, in order to absorb the heat caused by chemical action, thus cooling the plate, lessening the risk of overheating the resist, and permitting the use of a stronger acid. After these amendments the patent was granted, and (when we recall that applying the acid in a closed space was very old) Levy is hardly in a position to complain that the old inclosure is being used for the old purpose, and not for the purpose described in his specification. Westinghouse v. Boyden Co., 170 U. S. 558–560, 18 Sup. Ct. 707, 42 L. Ed. 1136; Krupp v. Midvale Co. (C. C. A. 3d) 191 Fed. 610, 112 C. C. A. 194.

It is perhaps not unlikely that Levy may have overestimated what he calls "the dynamic force of the impact (of) each atomized particle." These particles must be almost, or quite, microscopic, and we incline to believe that they are carried along and enveloped rather than projected. In the striking phrase of Prof. Chandler, the defendant's expert:

"They acquire no velocity of their own. They are not like little bullets shot out of a gun, which plough their way through the air. They are like passengers in a railroad train, or in a ship."

It would seem to follow that when the plate is reached, the enveloping air continually moving and being deflected interferes with such mechanical force as might otherwise be exerted by these minute particles. But the fact appears probable that in any event such particles would exert very little force during the short time required for the process. A body must have momentum, both weight and velocity, before its impact can have much effect. The blow of such particles can apparently be little more efficient mechanically than the blow of a feather. Indeed, if the impact were really forcible, the resist would be much more likely to give way than the metal. And Levy may also have gone somewhat astray about the cooling effect produced by the expansion of his compressed air. We merely note these matters in passing, for upon both the subjects just referred to we are not helped by the evidence as to facts, and the opinion evidence is not fully in

harmony.  But in any case, these were the patentee's theories, and his process was devised in reliance upon their soundness.  He could not have obtained his patent without using the closed space to expand his compressed air for the objects stated, and upon familiar principles he cannot now treat this element as of slight or no importance on the subject of infringement.

[2]  On that subject little more need be said.  The defendant's apparatus is constructed under the Holmstrom patent, No. 721,445, issued in February 1903.  This machine also produces excellent results, but it does not use compressed air at all, or any other propelling or carrying vapor; and, while it divides the acid into a spray, the liquid is not "atomized" in the definite sense borne by that word in the plaintiff's patent.  And of course there is no cooling of the plate by expanding air.  We agree with Prof. Chandler that in ordinary use "atomized" has a special and well-known meaning, and expresses "the form that liquids assume when they are projected by a blast of air or gas or steam."  What happens appears to be this:  The air, gas, or steam, breaks up the liquid into very small particles, and carries them along to their destination.  A well-known example is the throat-spraying device to be found in the shop of any druggist.  And that Levy had these facts in mind is clearly shown by the means he adopts to secure his spray, namely—

"by blast of air through the central tubes of the nozzles, so situated with regard to the surrounding tubes, the lower ends of which are immersed in the mordant, that the blast of compressed air operates to draw the mordant up out of the mordant tank and produce a blast of minute particles supported and carried along by the air-blast."

The defendant's machine does not "atomize" the mordant at all, and does not use air or gas or steam to project the acid against the plate.  It throws, or dashes, or splashes, the mordant against the plate by employing a rapidly turning winged shaft or spreader, this being made of stoneware, extending across the chamber, and revolved from the outside.  At rest the edge of the wing dips slightly below the surface of the acid and the plate faces the shaft in a slightly inclined and almost vertical position.  In motion the spreader acts as a scoop to pick up and hold a certain quantity of the acid, throwing it by centrifugal force across the chamber and splashing it over the whole of the opposite side.  When the acid leaves the spreader, its form is a thin sheet as wide as the spreader itself, probably 2 feet or thereabouts.  As this sheet is thrown off into the chamber, it breaks up into streams and drops varying in size and shape that are dashed against the surface of the plate.  The acid is not "atomized," but is rained, and this rain leaves the edge of the spreader at different angles, and is projected against and over the surface of the plate as well as the rest of the side or wall, flowing back into the tank after subjecting the plate to a fairly uniform treatment.  This is not the same operation as the process of the patent, for the defendant's spray is not the minute, uniform spray of the patent, and it does not carry with it expanding compressed air for the purpose of keeping the plate cool.

With regard to the infringement of apparatus claim 20, we also agree with Prof. Chandler, whose testimony is as follows:

"The etching-box or chamber, B (of the patent), is another separate vessel open on one side permanently, and with a cover on the other side, which is presumably movable. This box, B, is inverted so that the open side of it goes down into the tank which contains the mordant, its edges resting on the bottom of the tank. Also, resting on the bottom of the tank but within the sides of the box, B, is the air-chamber. This air-chamber is not an empty space, as would appear from the diagrams. On the contrary, whenever the apparatus is in use, this air-chamber is filled with compressed air. It is a reservoir for compressed air, and, more than that, it is a distributor for compressed air to the 36 nozzles shown in the diagram, which constitute the means for projecting the mordant against the plate. The air-chamber, therefore, of the patent is not merely an empty space in the corner of a box or a room, in which an operation proceeds, nor is it the whole space in the box or the whole space in the room in which an operation takes place. The air-chamber of the patent and of claim 20 is a special device of comparatively small dimensions immersed beneath the surface of the mordant, covered by the mordant, where it sustains as well as feeds the nozzles. There is no such device in the apparatus of defendant. It has no use for such a device; it has no compressed air to put into it, nor has it any use for compressed air. It appears, therefore, that the defendant's apparatus is not the apparatus of claim 20, because it has no tank and it has no air chamber such as the claim calls for."

As the defendant does not infringe the claims in suit, the decree is affirmed.