## NATIONAL METAL MOLDING CO. v. TRIANGLE CONDUIT CO., Inc.

(District Court, E. D. New York. October 9, 1923.)

1. Patents ☞328—1,004,643 and 1,004,644, for machine and method for armoring cable, held valid but not infringed.

The Gilson patents, No. 1,004,643, for mechanism for making armored cable, claim 9, and No. 1,004,644, for method of armoring cable claims 1, 2, and 3, both of which employ the winding instead of the die bending method of the prior art, *held* not anticipated and valid, but not infringed by a machine of the die bending type.

2. Patents ☞310(7)—Claim of infringement must rest on defendant's actual machine.

An allegation by defendant that its machine is that of another patent cannot change the actual facts and establish infringement, even though the machine of the designated patent would infringe.

In Equity. Suit by the National Metal Molding Company against the Triangle Conduit Company, Inc. Decree for defendant.

Cooper, Kerr & Dunham, of New York City (Marshall A. Christy, of Pittsburgh, Pa., and John C. Kerr, of New York City, of counsel), for plaintiff.

Wentworth, Lowenstein & Stern, of New York City (Henry J. Lucke, of New York City, of counsel), for defendant.

CAMPBELL, District Judge. This is a patent suit brought by the plaintiff to restrain the alleged infringement by the defendant of patent No. 1,004,643, mechanism for making armored cable and similar products, issued by the United States Patent Office on October 3, 1911, to Henry R. Gilson, assignor to National Metal Molding Company, the plaintiff (Plaintiff's Exhibit 1), and patent No. 1,004,644, armoring cable, issued by the United States Patent Office, on October 3, 1911, to Henry R. Gilson, assignor to National Metal Molding Company, the plaintiff (Plaintiff's Exhibit 2), and for damages.

The defense is invalidity and noninfringement.

[1] The plaintiff in this suit bases its claim under the machine patent (Plaintiff's Exhibit 1) on claim 9, which reads as follows:

"9. In a machine of the class described, the combination with means for coiling a spirally wound metallic armor upon and in binding engagement with the surface of a cable, whereby the latter is fed forward, of means for compressing and further setting the coils upon the cable."

And under the method patent (Plaintiff's Exhibit 2) on claims 1, 2, and 3, which read as follows:

"1. The method of armoring cable, which consists in coiling about and continuously drawing down into binding engagement with the surface of the cable a spirally wound metallic armor, and thereby feeding the coils and cable continuously forward.

"2. The method of armoring cable, which consists in coiling about and continuously drawing down into binding engagement with the surface of the cable a spirally wound metallic armor, thereby feeding the coils and cable continuously forward, and then compressing and further setting the coils.

"3. The method of armoring cable, which consists in coiling upon a cable a spirally wound metallic armor, and then abruptly bending the ar-

mored cable and causing portions of adjacent coils to momentarily bind against each other, thereby neutralizing the torsional strain induced by the coiling."

The object of the invention of the machine patent (Plaintiff's Exhibit 1) is best described in the patentee's own words:

"It is the object of the invention to provide improved mechanism for forming upon electric cables an armor composed of a metallic strip or strips applied helically thereon, in such manner that the armored cable shall be flexible."

The machine shown in said patent is said to be adapted for the formation and application to the cable of an armor made up of four metallic strips (Plaintiff's Exhibit 1, p. 1, lines 24–26), but the inventor also says that the machine may be readily adapted to the manufacture of flexible armored cable or tubing from one, two or any desired number of metal strips (Plaintiff's Exhibit 1, p. 4, lines 4–8).

The defendant claims that the machine as described and illustrated in the said patent in suit is incapable of operating as is stated in the specification and as set forth in the claims in suit, but I am unable to find that the defendant has sustained such claim. The fact seems to be that 400,000 or 500,000 feet of four-ply armored cable were manufactured by the plaintiff on a machine constructed in accordance with the specification and drawings of said patent, but was not commercially successful because it was too springy, and it further appears that two-ply armored cable has been, but single-ply armored cable has not been, manufactured by plaintiff on a machine constructed in accordance with the specification and drawings of said patent.

The failure to manufacture single-ply armored cable on such a machine does not prevent the plaintiff from seeking to recover under its patent.

Single-ply armor was old at the time the patents in suit were granted, but it was made on machines of die bending type.

The machine patent in suit (Plaintiff's Exhibit 1) is a combination patent.

After some description which it is not necessary to quote, the patents in suit provide:

"The strip-bearing surface of the mandrel 24 is slightly tapered, and has formed thereon a helical shoulder or shoulders. In the drawing there are shown two of such shoulders formed by a pair of parallel helical grooves 25 and 26 running throughout the length of the said bearing-surface of the mandrel. While this is the preferred construction, it will presently appear that in many cases a single shoulder may be sufficient, and that it need not necessarily run the entire length of the said bearing-surface.

"The metallic strips to be coiled, which have preferably been previously flanged along their edges to give them the form shown, are carried upon and drawn from reels carried by the rotating sleeve 9. In the machine shown, the two inner strips, 1, 1, are carried upon reels 27, rotatably mounted in frames 28, secured to arms 29, which project radially from the sleeve 9 at diametrically opposite points. Reels 27a for the two outer strips 2, 2, are similarly mounted in frames 28a, secured to the arms 29a, projecting from the sleeve 9 between and at equal distances from the arms 29. The reels are preferably mounted on journals 30, 30a, removably secured in the respective frames in the manner shown in Fig. 4. Reels 31 for the two lining

or filling strips *3, 3,* are carried by arms *32* fastened to the arms *29* adjacent to the reels *27* for the inner strips.

"Upon the inner end of the sleeve *9* is fastened the coiling-head *33,* in which are mounted the guides *34, 34a,* for the strips so arranged about the mandrel as to direct the strips forwardly tangentially upon the mandrel surface, as shown in Fig. 5. The guides are inclined forwardly at an angle to the axial line of the mandrel corresponding to the angle of pitch to be given to the coiled strips, and the reels and their respective guides should be so arranged that the strips will pass from the reels to the mandrel in approximately straight lines, as shown in Figs. 1 and 4. The guides *34* for the inner strips are disposed oppositely to each other, so as to direct the said strips to and upon the mandrel surface at diametrically opposite points adjacent to its base. The guides *34a* for the outer strips are also oppositely disposed in the head at distances of ninety degrees from the guides *34,* but at a distance forward over the mandrel required by the pitch to be given to the coiled strips, in order that the outer strips may be continuously coiled upon the coiled inner strips in the manner hereinbefore described. The filling strips *3, 3,* are caused to enter the guides *34* for the inner metallic strips *1, 1,* together with and between the flanged edges of the latter, as shown in Fig. 5."

Plaintiff's Exhibit 1, p. 2, lines 32–95.

"The helical grooves on the mandrel run in the direction opposite to that of its rotation, and the shoulders or abutments formed by the rear walls of the grooves are, by reason of the slight taper of the mandrel, enabled to abut against the rear edges of the inner strips as the latter are continuously coiled upon the mandrel surface. Since the mandrel is rotated in the direction opposite to that of the rotation of the coiling-frame and head, and at a higher rate than the latter, the said helical shoulders act to continuously push the formed coils forwardly along the tapered surface of the mandrel, thereby continuously drawing the strips from the reels. During this operation the reverse tension of the coiling-frame upon the strips draws the coils closely upon the tapering surface of the mandrel as they are fed forward, and thence from the tip of the mandrel down upon the surface of the cable, as shown in Fig. 3, so that the coils frictionally grip the surface of the cable and draw the latter continuously forward as the said coils are themselves continuously pushed forward.

"The speed of rotation of the mandrel should be sufficiently higher than that of the rotation of the coiling-head to effectively feed the coils forward as fast as they are formed."

Plaintiff's Exhibit 1, p. 2, lines 100–130.

"In forming an armored cable of the size shown in Fig. 3, I have attained good results by giving the mandrel three revolutions to one revolution of the coiling-frame and head, each of the grooves on the mandrel being one-eighth of an inch wide and encircling the mandrel twice to the inch." Plaintiff's Exhibit 1, p. 3, lines 1–7.

"Adjacent to the end of the mandrel *24,* and preferably as near thereto as possible, are mounted the sizing-rolls *35,* the peripheries of which are grooved, as shown, to form a pass *36* between them of the desired size of the finished armor cable or tubing. These sizing-rolls may be mounted, as shown, in suitable bearings *37,* supported in the opposite frames *38* mounted upon standards *39.* The bearings of the upper roll may be adjustable as shown. And while these rolls are shown as idle rolls, they may of course be driven if desired. By its passage through these sizing-rolls the cable is made of uniform diameter throughout its length, and they impart to the metal of the coils a firm and permanent set. The backward pull of the coiling-head upon the strips takes up the slight slack caused by the sizing and compression of the coils. As it issues from the pass *36* the finished cable or tube is given an abrupt bend, at approximately right angles to its line of movement, preferably by drawing or directing it downwardly over the periphery of the lower sizing-roll, as shown. Plaintiff's Exhibit 1, p. 3, lines 24–49.

"The strip-bearing surface of the mandrel *24* is slightly tapered, and has formed thereon a helical shoulder or shoulders. In the drawings there are shown two of such shoulders, formed by a pair of parallel helical grooves

25 and 26 running throughout the length of the said bearing-surface of the mandrel. However in a machine of this class, a single shoulder will in many cases be sufficient, and it need not necessarily run the entire length of the said bearing-surface.

"The metallic strips to be coiled, which have preferably been previously flanged, along their edges to give them the form shown, are carried upon and drawn from reels carried by the rotating sleeve 9. In this machine the two inner strips 1, 1, are carried upon reels 27, rotatably mounted in frames 28. secured to arms 29, which project radially from the sleeve 9 at diametrically opposite points. Reels 27a for the two outer strips 2, 2, are similarly mounted in frames 28a, secured to the arms 29a, projecting from the sleeve 9 between and at equal distances from the arms 29. The reels are mounted on journals 30, 30a, removably secured in the respective frames in the manner shown in Fig. 4. Reels 31 for the two lining or filling strips 3, 3, are carried by arms 32 fastened to the arms 29 adjacent to the reels 27 for the inner strips.

"Upon the inner end of the sleeve 9 is fastened the coiling-head 33, in which are mounted the guides 34, 34a, for the strips, so arranged about the mandrel as to direct the strips forwardly tangentially upon the mandrel surface as shown in Fig. 5. The guides are inclined forwardly at an angle to the axial line of the mandrel corresponding to the angle of pitch to be given to the coiled strips, and the reels and their respective guides are so arranged that the strips will pass from the reels to the mandrel in approximately straight lines, as shown in Figs. 1 and 4. The guides 34 for the inner strips are disposed oppositely to each other, so as to direct the said strips to and upon the mandrel surface at diametrically opposite points adjacent to its base. The guides 34a for the outer strips are also oppositely disposed in the head at distances of ninety degrees from the guides 34, but at a distance forward over the mandrel required by the pitch to be given to the coiled strips, in order that the outer strips may be continuously coiled upon the coiled inner strips in the manner hereinbefore described. The filling strips 3, 3, are caused to enter the guides 34 for the inner metallic strips 1, 1, together with and between the flanged edges of the latter, as shown in Fig. 5."

Plaintiff's Exhibit 2, lines 30–91, p. 2.

"The helical grooves on the mandrel run in the direction opposite to that of its rotation, and the shoulders or abutments formed by the rear walls of the grooves are, by reason of the slight taper of the mandrel, enabled to abut against the rear edges of the inner strips as the latter are continuously coiled upon the mandrel surface. Since the mandrel is rotated in the direction opposite to that of the rotation of the coiling-frame and head, and at a higher rate than the latter, the said helical shoulders act to continuously push the former coils forwardly along the tapered surface of the mandrel, thereby continuously drawing the strips from the reels. During this operation the reverse tension of the coiling-frame upon the strips draws the coils closely upon the tapering surface of the mandrel as they are fed forward, and thence from the tip of the mandrel down upon the surface of the cable, as shown in Fig. 3, so that the coils frictionally grip the surface of the cable and draw the latter continuously forward as the said coils are themselves continuously pushed forward.

"The speed of rotation of the mandrel should be sufficiently higher than that of the rotation of the coiling-head to effectively feed the coils forward as fast as they are formed. In forming an armored cable of the size shown in Fig. 3, I have attained good results by giving the mandrel three revolutions to one revolution of the coiling-frame and head, each of the grooves on the mandrel being one-eighth of an inch wide and encircling the mandrel twice to the inch."

Plaintiff's Exhibit 2, lines 95–130, p. 2, and lines 1–3, p. 3.

"Adjacent to the end of mandrel 24 are mounted the sizing-rolls 35, the peripheries of which are grooved, as shown, to form a pass 36 between them of the desired size of the finished armored cable or tubing. These sizing-rolls are mounted in suitable bearings 37, supported in the opposite frames 38

mounted upon standards *39*. By its passage through these sizing-rolls the cable is made of uniform diameter throughout its length, and they impart to the metal of the coils a firm and permanent set. The backward pull of the coiling-head upon the strips takes up the slight slack caused by the sizing and compression of the coils." Plaintiff's Exhibit 2, lines 19–33, p. 3.

We therefore see that the plaintiff's claim in both the machine and method patent is that the armor is wound upon and brought into binding engagement with the surface of the cable whereby the cable is fed forward at a location between the nose of the mandrel and the compressing rolls *35*.

The testimony shows that this is accomplished by the push of the helical shoulder or shoulders, the slip feed caused by the rotation of the mandrel in a direction opposite to the coiling head and at a higher rate of speed, and the drawing down of the armor by a back pull or tension.

The defendant claimed that plaintiff's method and machine have been disclosed in the prior art, and introduced in evidence the following patents to show the prior state of the art:

### United States Patents.

Goddard, No. 357,380, February 8, 1887, machine for making coiled wire springs. Discloses wire straightening device.

Duplain, No. 346,433, July 27, 1886, machine for winding lead tape upon telegraph cables. In the machine disclosed the tape is wound directly on the cable, no mandrel being used.

Gersch, No. 383,353, May 22, 1888, cable covering machine. In the machine disclosed the covering is wound directly on the cable and compressed by the three rollers, *E, E, E*.

Wilson, No. 543,587, July 30, 1895, machine for making tubing. In the machine disclosed the tapes or strips are wound on a rotating fluted mandrel.

Greenfield, No. 593,842, November 16, 1897, flexible armored conduit. Discloses the winding of two or more metal strips on the inner tube.

Greenfield, No. 630,501, August 8, 1899, Greenfield, No. 630,502, August 8, 1899, and Greenfield, No. 630,503, August 8, 1899. Discloses method and machines of the die bending type.

Sundh, No. 630,635, August 8, 1899, protective casing for electric cables or wires. Discloses single-ply protecting by winding overlapping strip.

Miller, No. 562,476, June 23, 1896, combined fence wire reel and straightener. Discloses wire straightening device.

Cole & Donnelly, No. 708,128, September 2, 1902, apparatus for the continuous manufacture of spiral springs or coils. Discloses mandrel on which the wire is wound.

Greenfield, No. 724,570, April 7, 1903, and Greenfield, No. 724,571, April 7, 1903, machine for making armored electric cables. Disclose single-ply die bending type.

Thibodeau, No. 794,433, July 11, 1905, machine for making tubing. Discloses the winding of single strips on a mandrel and the use of seaming rolls.

Waterman, No. 796,378, August 1, 1905, apparatus for making armored cables. Discloses a single-ply metal strip armor.

Berg, No. 876,257, January 7, 1908, machine for making flexible tubing. Discloses a stationary mandrel.

Greenfield, No. 877,073, January 21, 1908, machine for making metal tubing. Discloses single-ply die bending type.

Lutz, No. 969,712, September 6, 1910, method of making armored electrical conductors. Discloses mandrel and reducing rolls.

## British Patents.

Siemens, No. 251, July 19, 1878. Discloses use of mandrel.

Walton, No. 21,045, March 7, 1891. Discloses use of mandrel.

Naudin, No. 22,183, December 17, 1892. Discloses use of mandrel.

Stone, No. 2,203, February 12, 1887, improvements in the manufacture of wire ropes and cables. Discloses a straightening device.

My examination of these patents shows that the single-ply interlocked convolutions of armor for electric cables was old in the art long prior to the patents in suit, and also that the use of a mandrel, either rotating in the same direction as to the curling head, or stationary, was known to the art long prior to the patents in suit.

The expert witness for the defendant selected from the patents so offered in evidence the following as disclosing the plaintiff's method and machine:

Siemens, English patent, No. 251.

Walton, English patent, No. 21,045.

Naudin, English patent, No. 22,183.

Wilson, United States patent, No. 543,587.

Cole & Donnelly, United States patent, No. 708,128.

Thibodeau, United States patent, No. 794,433.

But I am unable to find in any of the patents offered in evidence by the defendant a disclosure of such method or machine.

The Siemens, Walton, and Thibodeau patents disclose a machine of the die bending type.

The Naudin and Cole & Donnelly patents disclose a machine for making springs, and the Wilson patent discloses a machine for making tubes.

While in some of the machines disclosed in said patents a mandrel, either stationary or rotated, around which the tape is wound, is found, there is not found in any of them a curling about and continually drawing down into binding engagement with the surface of the cable a spirally wound metallic armor, and thereby feeding the coils and cable continuously forward and then compressing and further setting the coils.

The plaintiff's method and machine patents are of the winding type, as distinguished from the die bending type, to which type the machines disclosed in the prior art belonged, and are limited by the plaintiff's claim, in both patents, that the armor is wound upon and brought into binding engagement with the surface of the cable, whereby the cable is fed forward at a location between the nose of the mandrel and the compressing rolls.

The defendant's machine (Plaintiff's Exhibits 13 and 14) and method differ from plaintiff's patents (Plaintiff's Exhibits 1 and 2). In the defendant's machine there are no plotted guides equivalent to the guides *34* and *34a* in plaintiff's patent, the mandrel is stationary and smooth, and has no helical grooves and no helical shoulder, but there is in front of the part marked "reel carrier" a cam-like extension, and I am convinced that the so-called cam is only a guide.

Many demonstrations were made before me on the model of the defendant's machine (Plaintiff's Exhibit 14), and I also had an opportunity of seeing defendant's machine in operation at its factory when I visited the same in company with counsel for both parties and the experts, and as a result I have formed the following opinion as to the defendant's machine:

In the operation of the defendant's machine for the production of its commercial product, the so-called cam has no operative effect so far as the feeding of the armor is concerned, or the armor head, but the feeding is by the three reducing and feeding rolls, otherwise called sizing rolls, and the so-called cam could not force the tape forward any more rapidly than it is advanced by the rolls, without jamming the tape against the rolls.

There is a tension or back pull of the tape in the operation of the defendant's machine, but the armor is not drawn down into binding engagement with the cable on the defendant's machine, between the nose of the mandrel and the sizing rolls, but such engagement is brought about by the action of the reducing and feeding rolls, otherwise called sizing rolls.

The absence of the plotted guides, equivalent to the guides *34* and *34a* of the plaintiff's patent, makes the defendant's machine one of the die bending type, which was known to the prior art, and in fact the defendant's machine closely follows the prior art as disclosed in the Walton British patent, No. 21,045 (Defendant's Exhibit D.).

Claim 9 of the plaintiff's machine patent (Plaintiff's Exhibit 1) and claim 1 of the plaintiff's method patent (Plaintiff's Exhibit 2) are not, in my opinion, infringed by the defendant's machine, because in order to constitute infringement there must be not only identity of results but identity of means or procedure for producing results. Westinghouse v. Boyden Co., 170 U. S. 537, 18 Sup. Ct. 707, 42 L. Ed. 1136.

I am unable to find either identity of results or means or procedure for producing the same in the defendant's machine.

Claim 2 of the plaintiff's method patent (Plaintiff's Exhibit 2) provides for "further setting the coils," but this is in conjunction with the coiling about and continuously drawing down into binding engagement with the surface of the cable, and I have held that the defendant did not by its machine draw down the tape into binding engagement with the cable before it reached the reducing and feeding rolls, otherwise called sizing rolls, and that such armor was brought into binding engagement with the cable only by the action of such reducing and feeding rolls, otherwise called sizing rolls. It is the setting and not a further setting of the coil that is occasioned by the said reducing and feeding rolls in the defendant's machine.

In my opinion defendant's machine does not infringe claim 2 of plaintiff's method patent (Plaintiff's Exhibit 2).

Claim 3 of the plaintiff's method patent (Plaintiff's Exhibit 2) provides for "abruptly bending the armored cable and causing portions of adjacent coils to momentarily bind against each other, thereby neutralizing the torsional strain induced by the coiling." This seems to me to be the reverse of what defendant does, because in the defendant's product the adjacent coils are brought into binding relation as succeeding convolutions are wound in overlapping relation, and the operation of the measuring machine used by the defendant is to measure the length, take out kinks or curvatures, and the taking out of the kinks and curvatures breaks down any frictional engagement which may exist between interlocking edges of the convolutions.

The defendant does not use the machine described in plaintiff's patent (Plaintiff's Exhibit 1), nor does the machine used by it form part of the machinery used for coiling and winding, as it is an entirely separate machine. This would make no difference with reference to the method patent if the method was the same, but it is not, as I have shown, and it seems to me that the defendant is fully justified by the prior state of the art in its use of the straightening and measuring machine.

I am therefore of the opinion that the defendant has not infringed claim 3 of the plaintiff's method patent (Plaintiff's Exhibit 2).

[2] Plaintiff makes a point of the allegation in the defendant's answer that "the armored cable made and sold by it is produced or manufactured by a machine substantially of the form shown in the novel and patentable invention of one Otto Fritiof Palmer, of Brooklyn, N. Y., and patented in the United States, March 23, 1920, No. 1,334,787, and owned by the defendant" (Plaintiff's Exhibit 15), but this allegation cannot change the actual facts. American Specialty S. Co. v. New England E. Co., 176 Fed. 557, 100 C. C. A. 193; Fried. Krupp Aktien-Gesellschaft v. Midvale Steel Co., 191 Fed. 588, 112 C. C. A. 194.

If this was not the rule of law, it does not seem to me that the plaintiff, even under the wording of the Palmer patent (Plaintiff's Exhibit 15), could claim infringement, because while the office of the cam 59 in said Palmer patent (Plaintiff's Exhibit 15, p. 2, lines 98–100) is said to be "to push from the tubular mandrel the coiled fabric that is being laid about or formed upon said mandrel," there is no statement or claim in said patent that the coils or convolutions formed on the mandrel are fed into binding engagement with the electric cable before the coils reach the three reducing and feeding rolls marked 66 in said patent.

That the said reducing and feeding rolls are the means for bringing the convolutions to the desired contour is clearly shown by said patent (Plaintiff's Exhibit 15, p. 3, lines 50–54).

I am therefore of the opinion that claim 9 of the plaintiff's patent in suit, No. 1,004,643, and claims 1, 2, and 3 of the plaintiff's patent in suit, No. 1,004,644, are valid, and I am also of the opinion that the defendant has not infringed any of said claims of the plaintiff's said patents.

A decree may be entered in favor of defendant dismissing the plaintiff's complaint, with costs.